Final case this afternoon is number 14-50879, Grogan v. Lange. So we'll hear from Mr. Dunham whenever you're ready. At the pleas of court, Mr. Hawkins, my name is Jim Dunham, and I'm here with Andrea Maeda and Dan Walsh. We represent Mr. Grogan and Ms. Farley. There's a number of questions here. To me, the fundamental one is are we going to eliminate the long-established requirement of the Pickering conic balancing test and the spectrum analysis that this court has used over and over again regarding a public servant in the First Amendment. The trial court appears to have just adopted a label approach that these are policymakers, and because they're policymakers, end of story. There's no requirement to go in further. Let me be sure I understand what relief you're seeking. Are you seeking a jury trial on whether they're policymakers? Are you seeking the opposite outcome, in other words, that we would weigh all these things and say they weren't policymakers, or if they were, they didn't have to support this sheriff? I mean, in other words, he couldn't sue them, he couldn't fire them or demote them even if they were policymakers. I mean, what is the — if you — what's a win for you on this? Because I'm trying to understand whether you're claiming a fact issue or you're just claiming that the law should have come out your way or what. No, not at all. I think there's a fact issue. Okay. What is that fact issue? What is the jury going to be asked if you win? Well, and I will tell the court I'm not certain about jury, because if we look at Jordan and Wiggins and Brady, they had juries, and then there's questions about is it advisory or not. But I think that there are fact questions for sure. I believe we're entitled to a jury on those issues. Okay. What are the fact questions? I think that we look at the elements for the court to consider. First off, there's the spectrum and where you fall on the spectrum. But in terms of the fact issues, there are questions in regard to the degree to which the speech involves a public concern. I actually don't think that's a fact issue, because this is voting or in support. The next one is, is a close relationship essential? And the cases, as I read them over and over again, talk about was it disruptive? Was the behavior of the employees disruptive? Okay. And what evidence is there that it was disruptive? It wasn't. Okay. So why is there a fact issue on that? Well, I'm trying to give the benefit of that. Okay. It is their burden, it is their burden under Gonzales to prove disruption. And in this case, what these folks did, worked there almost 20 years, and they had a colleague that was running for sheriff that evidently they'd worked with a long time. No, we understand the facts. They go to a . . . I didn't see any evidence that anybody was disrupted. It was not. Okay. And in fact, the sheriff was willing to keep them in the office by demoting them, right? There was actually evidence on there that from one of the people that said that you backed the wrong horse that said that we need to get them out of the office, and the way to do that is we demote them, and we're going to make it a situation where they need . . . But the offer that was made that they resigned in lieu of was demotion, wasn't it? Yes. Okay. So they were . . . they had the option of . . . But my point is that it seems inconsistent with the idea that these are disruptive people to keep them there, albeit demotedly, because they're still in the office. Bell County is not that big, so they're still in the office. But they weren't disruptive. I mean, if you look at . . . That's my point. I mean, this is a helpful question to you. No, I agree. I hear what you're saying. And that's why this . . . when we read the opinion from the district court, we just sort of didn't . . . you know, it seemed to be one of the more simple issues. Okay. So tell me what it is that you think is not what they think is a fact issue. What do you think is a fact? What was decided against you that you think involves a question of fact? Well, I think that they're not policymakers. Okay. I think that, for example, Mr. Grogan was offered Ms. Farley's job. And so if she was this . . . if that position was one where political affiliation is essential to, you know, the exercise of that job, they wouldn't have offered Grogan Farley's job. So he just said they're policymakers. And I think there's a fact issue on that. I don't think they're policymakers. If you look at Grogan, he's the jail administrator. And this court has said that heads of sheriff departments . . . In fact, in Brady, one of the people was a jail administrator. In Vovaditch, which is cited in Gentry and in Brady, we had a commander of the narcotics unit. I mean, these are department heads that this court has continued to say are not policymakers, or at least that the Wayne balancing test weighs in their favor. And in Kinsey-Salado, we held it as school superintendent. I don't think policymaker is exactly the term. I think the question is whether they're employees whose job duties are sensitive and confidential vis-a-vis the elected official. And I agree with you. And as to Mr. . . . And I'm very dubious about where the line is to be drawn on what goes to a jury, because what you're talking about is a decision of the law by the court as to the extent that these people do not shed their political association rights by being involved in arguably sensitive positions. I think in the Kinsey case, for instance, we decided that as a matter of law. And in Kinsey, I think the court is exactly right. You had a superintendent that campaigned against the slate for all the school board. He was very active. He went out and campaigned actively. He talked bad about the other side. I mean, I think when you get in the spectrum, Kinsey's way over here. And I agree with you. This is an unusual case because these are all people within the Republican fold. And it's dirty, you know, low-class politics. But the extent of the disagreement, who knows. But just let me say what I want to say. And that is that being the jail administrator to construct a $38 million facility, to handle an $18 million annual budget, to supervise I believe it was 800 inmates, to be responsible for 200 employees is not the only job that the sheriff does, but it's delegated because it is an extremely big job and has extremely big potential political consequences. Everything from handling the contracts to being the point man for inmate security. Now, how can that not be a critical position vis-a-vis the elected sheriff? Well, because Sheriff Lange himself said that political affiliation and supporting him politically was not essential to that position. He actually hired someone who he didn't have any idea what their political affiliation was. Where did that person come from? Does the record show? Yes, it's in the record. I don't know if it's cited in the record, but she came from Gatesville, I believe. She came from Adjoining County. And actually she was interviewed by the first deputy, the chief deputy, and then later on went to see Mr. Lange. I think the chief deputy actually hired her. But again, I'm not sure. I agree with you that certainly Sheriff Lange was very candid in saying that political affiliation isn't required here. But as an inherent nature of the job, I'll tell you if Harris County's jail suddenly suffered a big riot, the people of Harris County, Houston, Texas, are not going to go after the jail administrator. They're going to go after the elected sheriff. I agree. But I also think if a low-lying jailer sexually assaults an inmate or does something inappropriate, at the end of the day the sheriff, it's going to reach up to him, it's going to be in the newspaper, and the sheriff's going to get hit. Let me ask you this, because to me the question isn't whether the jail administrator is a policymaker, because I think they probably are for the reasons Judge Jones stated. But Vogvodich, as well as several other cases, have said that doesn't end the matter. In other words, if they are a policymaker, you still have to show that their political affiliation matters to the job and their political loyalty. And that's your argument is the sheriff didn't even care about this other lady that he brought in and whether what her affiliations were and what her loyalties were, nor did the sheriff think these people couldn't affect more specifically can they carry out the sheriff's way of doing things. If the sheriff wants to run a law and order versus a progressive or whatever the district court said, there's no indication here that the sheriff thought these two couldn't do that. In fact, he said the opposite. So is that a fact question or is that as a matter of law the district court was just wrong on this? I think he did not conduct any balancing test whatsoever. He just said this guy's over 200 people, therefore he's a policymaker, and he was going to use a litmus test. If he can label you a policymaker, he's not going to go through the Pickering analysis. He's not going to look at that broad spectrum. That's what the judge apparently chose to do. What remedy do these people seek? We're seeking that this go back. And number one, I think there's a fact issue actually for certainly on Ms. Farley, whether she was a policymaker. And I would still say that if you look at Mr. Grogan, one of the cases actually talks about to the extent to which this job is regulated by federal, state, and other regulation. And I think when you look at the jail administrator and all of the federal and state laws, I mean really what a jail administrator is doing is trying to stay out of federal court and elsewhere and comply with those types of laws. There's very little discretion involved. Okay, so there's a fact issue on that. Who's going to decide that? I think that— District courts are already found against you on that. Well, I think if we look at Brady, Brady says that these are very fact intensive and it may be appropriate to characterize them as mixed questions of law and fact. And so I think if you're going to follow Brady, you're going to send it back and ask the trial court to determine who is the policymaker. It may end up being an advisory. That's at least what a couple of these cases say. An advisory jury? Yeah, that's on some of the issues. And I think that— Okay, so let's say that they find that at least Grogan is a policymaker. Then who does—who is supposed to do the balancing? The jury? The district court? Or the appellate court? I think that it is a mixed question. I think that they have the burden to prove that the conduct of these people was disruptive so that it interfered with the inner workings of the law. Suppose versus consumer union it's matters of fact and law and the district, the judge makes the call. Well— That's what the Supreme Court said. And I'm being candid. In looking at Jordan and Wiggins and Brady, it was unclear to the judge. Well, it's not unclear. Well— I mean, maybe we didn't express ourselves clearly, but the Supreme Court is very clear. Brady just says— You may be right about an advisory jury, but the ultimate decision as to whether this person has the . . . conic pickering is always the district court decides. And in this case— And then it's only a question of causation. In most cases, here there's no question of causation. No question. And, you know, I have to give it to Sheriff Lange. He's old school. You back the wrong horse, this is Tammany Hall old stuff. You're out. Set an example. Was he in the sheriff's department? He was a commissioner. He was a county commissioner. Well, that's what it was. And Patterson had been in the sheriff's office for a long, long time. Retired. Yeah. And like I said, our folks, what they did, they showed up at a chilly supper and they went to one fundraiser and they put out one yard sign. They didn't do anything like Kinsey did. Okay. So let's get back to remedies or remedies. So let's . . . you're saying . . . I mean, to me, what are we sending it back for? If it's a matter for the district court, the district court's already made all these weighing and determinations. What is it that we're supposed to do that would make a different outcome in your view? Well, I think if you look at the record, there is no evidence of disruption whatsoever, and I believe that that is on the sheriff's office to prove disruption. If there is no disruption, you look at the conduct. The conduct is going to a chilly supper and putting out a yard sign. It's clearly not . . . that's clearly not disruptive. And even Sheriff Lange says there is no political affiliation needed with this office. And this court has said . . . But you're saying reverse and render in your favor. I believe there's an issue of damages. Okay. Render in your favor on liability . . . Yes, Judge. . . . and then it goes back for damages. Yes. I mean, that's what you're asking? That's what I'm asking. Okay. And I think that it's harder to argue because the trial judge didn't check any of the elements. But if we look at the record, every one of those elements is in our favor. Except policymaker. I don't think on Grogan it's in your favor. You can argue it. I mean, you can argue it, but I don't know that it's in your favor. But what I'm saying primarily in regard to Grogan is he didn't look at any of the elements that we look at in Gentry and Brady and Kinsey and McBee and Bob . . . Bobovich. Sorry. Bobadich. The V case. I don't know how to pronounce the J. I don't think you'd pronounce the J, so it tangles me up. Well, as you see, I've been playing with these issues for quite a while. And in the first Brady decision, what concerned me was that the Fifth Circuit seemed to deviate from the law of all the other circuits in regard to deputy sheriffs. This Court seems to be very consistent from that . . . In deviating. And the other thing that concerned me was that Texas has a statute that says that they always serve at the pleasure of the sheriff. Well, but the cases are that that's the at-will nature and that . . . That the person . . . I believe that Bobadich and that overrules that. And I think the cases speak to that. And you have spoke to that. Of the cases, the dozen cases we've found on this issue that this Court has ruled on at least five of them are sheriffs. This is evidently an issue in Texas with sheriffs letting people go for political reasons. And every one . . . That's because they're very political jobs. No question about it. Well, that may change. The Texas legislature is just sending a bill to get the straight ticket voting out of sheriff's offices. I don't know. I don't know if that will pass knowing the bills in the Statehouse. They won't. But that . . . Obviously, there's a recognition of this in the state legislature. Okay. You have time for rebuttal. Thank you very much. Mr. Hawkins, you have your old school sheriff to defend. I have a very good sheriff to defend who's a very honest man, I think. And one of the things I really want to point out is the cases that, as a matter of fact, Judge Jones noted in her footnote in the Gentry case, a lot of the cases that went against the sheriffs because the sheriff said political issues were not important. This sheriff said . . . And, of course, you're going to say, well, is political affiliation important? And if the sheriff himself has said, no, it wasn't important to me, then he has said not. In this case, the sheriff said political affiliation was important, and it was important that you at least not have run against me, that you at least not have campaigned against me, that they say they hired somebody who was new, but give me somebody who comes in who's not already taken a public position against me to supervise the jail. I mean, the sheriff said political affiliation is not relevant to this office. And so that, I think, hurts on that argument. As well, I'm not sure that supporting one guy versus another guy in an open primary where nobody's incumbent is necessarily against anybody. I can just think John's a better person to be sheriff, but I can also think Jane would be an awesome sheriff. I can think they're both great candidates. I just think John's a little bit better. Why does that mean I couldn't accept Jane as sheriff? I may think she's terrific. I just thought John was a little bit better. That's the nature of these kind of open primaries. When there's an incumbent, it's always somebody running against. I understand that. I understand that very well. But when, I mean, in a prior life, I had to run for office, and I think I understand the idea of people running for an open spot. And it isn't necessarily, it can be, people can get very nasty, but there's no indication that these folks called out, you know, now Sheriff Lange or anything like that. So why is it ifso facto they must have opposed Lange because they supported, I believe it was Patterson, if I'm remembering the name. Well, there are the cases which have made it clear that supporting, it can be political affiliation, Republican or Democrat, or it can be the individual person involved. And there are cases in the Fifth Circuit on that which deal with the exact situation which we have here, which is. But if the sheriff was so offended by this, then why were they retaining these people, and Grogan particularly just in a lesser position? If the person was such a political threat to him, why would he want them around at all? I think what the sheriff indicated by his actions is it's important that he have one person who's in charge of the jail that he knows is in line with his approach, rather than having the jail run by people who he's not in line with his approach. And so by putting in the new jail administrator, they had one person who the sheriff said, I'm comfortable with this person, and they're supervising the entire jail and moved the other people down a notch. It didn't mean the other people were bad people, but it meant that he wanted to have a person of his own choosing above them so that he could see that the place was managed efficiently and appropriately and not have disruption. But there's no evidence there was disruption and no evidence these folks couldn't carry out Lange. It's not like I think everything should be done X way and the sheriff thinks it's totally not X. There's no indication, really, of any dissonance among these people in policy or in how to run things or anything of that nature. And one of the things I want to get to in this case is one of the things not briefed in this case is the Gracioso case,  and it goes through the dismissal of a police sergeant, and it is very relevant here because one of the things it talks about is it is not necessary for disruption to have occurred, and it cites back to the Connick and Nixon cases, but it's whether there's a potential, a reasonable potential for disruption. It talks about, you know, you're not allowed, you're not required to wait until your office has been disrupted, your efficiency has been interrupted. What disruption would there be? I mean, there's no indication that these folks really did very much of anything for Patterson. They never said anything against Lange. They never did. I mean, sometimes you have campaigns where somebody is stealing the other people's yard signs and all kinds of crazy stuff, and I could see how that would be disruptive going forward, but there's nothing like that. They thought Patterson was the better guy, but there's no indication they don't like Lange or think Lange would not be a good guy until, of course, he demoted him and all that, but that's a little different. That's what I'm saying. I think, number one, it's not required that disruption be shown, and that's evidence in the Gracioso case, Connick cites that it's not necessary for an employer to allow events to inflow, that this disruption of the office take place or disruption of working relationships. But it's always the potential for disruption. I mean, there's a potential for disruption in this courtroom. Somebody right now could stand up and start screaming. I can't say that won't happen, but I have no reason to think it will. So that seems to me to be a very circular argument, the fact that something possibly could happen, but there's absolutely no indication that anybody in this courtroom is going to act like that. But there's a potential because it could happen because I don't know everybody in here. I mean. I disagree to the extent of is it possible that if you don't have control of the person who's implementing your policy, that your policies won't be implemented the way you want them to? Absolutely. Is that a reasonable thing? Is that what the court decided in Gentry? If we don't have the county administrator and the county road manager abiding with the political wishes of the people there, has that got a potential for disruption and a potential for strains there? Absolutely. And that's what the court held in those two cases. Those people in those positions were of such high positions that it was appropriate to have the political influence and it was appropriate to have them replaced by the persons that were chosen by the elected officials. Well, so do you think the district court was right to just address the policymaker issue and then stop at that without any kind of balancing after that? I would allege that there is a balancing that takes place in that and that we briefed on that, that the court may not set out the steps, may not set out the exact details, but the same arguments that the plaintiff make in this case against this case are the same ones they apply to the Gentry case. And I think in the Gentry case, the court correctly applied the law, correctly applied the balancing test, and the court did the same here in the district court here. I'll point out in the district court here, this was the second case that this judge, Judge Nowlin, had on this issue. The first case, he did not grant a summary judgment and that case went on. What was that one about? That was the McLennan County Sheriff who had a number of employees up and down the ranks from high to low and the court denied summary judgment there. And then a month or two later, we applied for summary judgment in Bell County with different facts, with policymakers, high-level positions, two people only, and the court granted the summary judgment here. What's the basis for your contention that Farley had a high-level position, a jail administrator position? Yes, Farley was a lieutenant, had a jail administrator. She supervised 100 people. She had a great deal of influence on budget, control, a great deal of discretion. She operated the jail. Well, of course, the problem with that is that he also tells his political opponent, Grogan, that he can have Ms. Farley's position. Well, I think it is important. How do you square that circle? I think it's important that the sheriff is not at the jail and is not controlling the jail. I think it's important that the sheriff have one person over there who he trusts to supervise the jail. So he did the minimum with just moving Farley down one level and putting the person he trusted in above Farley to see if that . . . Is that explained in the deposition? I don't recall whether that's . . . He did depose, right? I mean, that's how you got the . . . or was it just on affidavit? Yes, there were some affidavits, some depositions. But, I mean, he didn't explain, go through your reasoning process, to say that it was okay to have him in a position that he says is otherwise . . . I don't believe there's . . . . . . immune to the First Amendment. Yeah. But I think that makes sense. I think, quite frankly, two things. One, I think both people qualified as policy makers. And number two, another thing about the . . . It's very disturbing that both sides keep using policy makers as the example because in Brady, too, Judge King clearly said that is not the right terminology. But anyway . . . Okay. Well, I think they have high-level positions that are endowed with a lot of discretion and ability to affect and to impact whether the elected official can get his job done . . . . . . or he can get his policies implemented, just as the road administrator or the county administrator and the road manager . . . Ms. Farley was pretty clear. I mean, although she had some hiring and firing discretion, she didn't enter into contracts. She didn't make policy about who could be hired or fired. She didn't make policy about anything. She was subject to the whims of . . . Of the minister. . . the desires of Grogan and Blaschero. Right. I think we can debate that issue. I believe that she had a great deal of responsibilities set forth in her resume, set forth in her job duty description. And I think she had that. And I think it's applicable here. The other thing I would note is in the Gracioso case, which is a police sergeant being fired . . . One of the things the court talks about in the Gracioso case, which is just out a month, is that we tend to give more leeway to a paramilitary organization like the police. And this sheriff department involved in this case would be exactly the same situation. Except that our cases don't really give more leeway. They don't. But I think one of the things . . . the footnote that Judge Jones wrote, that you wrote in the Gentry case . . . That says, in a lot of these cases, go against the sheriff. But it's because, a lot of times, the sheriff didn't allege that political influence were necessary. Do you have a site to the Gracioso case? It's a Lexus site. 2015 U.S. App Lexus 370. Gracioso versus the city of Greenville, Mississippi. Okay. Thank you. Thank you. The . . . I think that there are a couple of other points I would like to make, is that . . . So, it's your contention . . . I mean, one of their principal arguments is that the judge was required to do pickering conic. And, you know, that is . . . I think that's pretty clear in the Brady 2 case. But, even though he didn't expressly do that, he implicitly did it. Well, I think that's right. I think we're not judging Judge Nowlin's paper like a law school exam. He says he goes through the process . . . You'd be surprised. Well . . . It helps to have the right sites in. Absolutely. He's a very good friend of mine, don't we? Well, Judge Nowlin's a very experienced judge. And, like I say, he had, a month before, denied summary judgment in a similar case, but had different facts because the people weren't high-level employees. And, he did grant it in this case and said it wasn't even close because of the high-level nature of these employees, because of what they could do, and because of the importance of having somebody . . . But, it seems very speculative. He says, you know, what if we had a law and order and these people were progressives, as if we had like a very far-left guy come in to replace a far-right guy, or vice versa. There's no indication these people are anything other than shades of the exact same side of the spectrum. In fact, they might be identical in political views, for all we know from this record. So, to me, that doesn't . . . Again, I'm back to the idea that when two people are running an open primary, it could just be you're better friends with the one, or you just like them a little bit better, but you think it's two great candidates. You think it's amazing that Bell County has got these two great people running. That's so fantastic. Or, you might think one of them is terrible and the other one is just a little bit better than the terrible, but the lesser of two evils. From this record, we have no indication that they thought poorly of Lange or expressed any sort of view of Lange as being incapable or inappropriate or having different policies or anything. I would suggest that, number one, the cases from Connick on down say that you don't have to wait for disruption to occur, that you can go ahead and do it. Number two, that is . . . Yeah, but then the disruption thing has no meaning at all, because you can always say there could be disruption. What has happened in the Gentry case, in other cases, people tend to make these decisions right as they change, right as they take office, so before any action has actually happened. And also, in terms of your political enemies, in Bell County, you don't care if a Democrat doesn't like you, because a Democrat is not going to beat you anyway. It is the Republican people that are going to run against you, so that in terms of his most fear is not of a Democratic candidate running against him. His biggest fear is another Republican running against him. So the people you talk about are exactly the people that he has most fear of. Okay, but then why is he keeping these people around if they're his enemies? I mean, they're so disruptive and they're his enemies and all this kind of stuff, but he's keeping them in the office, just demoted one level. Why? Because he believes with one person above them to report to him that he can manage the jail approach. Well, why can't he manage Grogan and Farley himself? I mean, in other words, if they're reporting to him, why can't he watch and make sure they're— and if they do cause disruption, then he has a ground to fire them that doesn't have anything to do with politics. He says, you're not carrying out my requirements. Because I think you're saying, do we require under the First Amendment deals that you allow these people to continue in their high-level positions and you hopefully can catch them before they change your policies or undermine your policies, which they may do by overt or covert means, or do we allow the person who was elected by the people to insert his person at the top level? See, here we have a guy that's saying, I want to do political payback, and here's how I'm going to do it. We really have no evidence on all these other things. We have no evidence that they're disruptive, no evidence that they would undermine his policies, no evidence that they disagree with him on anything, no evidence that they dislike him or think he's unqualified. None of those things. What we have is pure political payback. You back the wrong horse, you're down. Not out, but down. And the cases clearly say several times throughout these cases, which is a very common deal, that if you take position against your boss and you're a high-level position, then you have forfeited your right to the protection of the First Amendment. See, this guy wasn't their boss. That's my point. It's not the incumbent. I understand the incumbent is a different thing. Anybody who runs against an incumbent is saying the incumbent's not doing an adequate job for some reason or another. But when you have two people running for an open spot, there is no boss. Are you aware of any case that makes that distinction? I'm not aware of any case that makes this distinction. And, in fact, it often comes up in election situations that they are, in fact, running against people, and then as soon as the election takes place, it's like the Gentry case. As soon as the election takes place and their person didn't win, then this happens. And that's a school board case. It probably wasn't even a party case. Well, didn't Lang say something to Grogan to the extent they'd always worked well together and they'd been a pleasure working with and things like that? I think everybody was courteous to each other, but I think it's still the deal is, is there any reason that the newly elected sheriff does not have the right to have his people in these high-level positions, and the case law is that they do. I think you'd have a, you know, this would not be a difficult case if your client hadn't been so brutally honest or complimentary or whatever it is and saying, sure, I can work with you. You've been a great guy in the past. Or, no, it's not that important in the job. No, I didn't care about who I replaced him with. I think he's entitled, as the sheriff, to say how much protection he needs. And had he fired both these people, I believe that would have been appropriate. And had he said, I can get the protection I need by having one person over there who can watch them on my behalf. Then you're sort of transforming what's supposed to be a fact-specific balancing test, and I will, you know, Brady II sets a standard for this. You're transforming it back into a labeling deal, per se labeling. I think that these people have high enough positions and wide discretion that under all of the cases, they qualify for a person who forfeits their First Amendment rights, and the fact that we didn't forfeit them fully, the fact that the sheriff showed some degree of mercy or kindness or whatever and let them keep their jobs. If I'm a full-time employee and I'm offered a lower-paying job working under my secretary, nothing against my secretary, of course, for 30 percent less, I don't really think that's mercy. Well, that is the same job that he had and the same pay he had 13 months before. That's point taken. And the other lady was offered a $3,000 reduction. So they were pretty modest changes. Now, they wouldn't have been, you know, they're not desirable, but pretty modest changes. But the fact that he didn't do more, I don't think, forfeits his rights to have the people he wants to in charge of his departments so that he can implement the policies that he wants as the elected sheriff. And under the case law, these people, by taking their action against him, have forfeited their First Amendment rights in this position. What were his policy differences with running the jail? What did Grogan do in running the jail that this laying didn't like? Well, we don't know. And we're not required to know because we're not required to take the position of letting Grogan run the thing for six months and finding out that he's not implementing our policies. We're not required to do that under the case law. We're able to make the change right now. Do you know for a fact whether what I said a long time ago is still the truth, that this court takes a different position vis-a-vis deputy sheriffs than other circuits do? I believe that is still correct. Well, if you want to send us a letter with some citations to that effect, it might be helpful. Okay. I will do that. All right, sir. Thank you. Mr. Dunham, rebuttal. Just a few things that came out. The McNamara opinion was reversed because there was a motive question. Sheriff McNamara said it was all these other reasons, and the plaintiff said it was First Amendment. So that's why that was reversed. And I think here we know the motive was First Amendment, so the question is just whether your people, according to your opponent, lost their First Amendment rights, which sounds huge to me. The standard is not possibly could disrupt. It is likely to disrupt. That's what Gonzales 2 says. And now analyzing the record and what's intimated in the opinion, there can be nothing intimated because there's no record of any of this stuff. If we were to look and it was . . . Well, that's nonsense. You don't go on the facts. It's all a prediction. Just as the same as the school superintendent was a prediction that once he had campaigned for the other side, he was going to not do what the school board wanted. But let me ask you another question, though. In your view, is this . . . does this case, if it goes off in your favor, do so because, as a matter of law, the jailer and the assistant jailer were not involved in positions in which, to use Judge King's terminology accurately, political affiliation had something to do with the job? That's correct. Or is it based on the fact that Sheriff Lang made concessions to that effect under the circumstances of this case? I don't think he made concessions to that. If you're saying by demoting them that he made concessions to that . . . No, made concessions because he said the politics was not important to the job, and he said that he didn't even investigate the politics of the woman who took the final chief jailer position. And he himself offered the assistant jailer position to the man who he had just said he couldn't work with. I think it's both, Judge. I mean, I think it's both. Well, it obviously makes a difference for the direction of the case law, right? And I agree, but under both of those, I believe we get to the ultimate same result. Well, you might, but what I'm saying is there's a narrower path and there's a broader path. Well, in this case . . . And I ask you which one is better, which one you're . . . What I believe is we can take Sheriff Lang by his word. And what he said is he appreciated always working with Grogan. He had always worked well together with the guy. I can't believe he went to the other guy's fundraiser. That's what he said. Lang said there was no disruption. They weren't in the jail campaigning. They weren't doing all that kind of stuff. He said that Farley and Grogan never made any negative comments about him. He says there's nothing in the description of the job that's political. He didn't even ask the replacement of Grogan whether or not what she thought about his policies and all that kind of stuff. And Grogan, yes, he had a very important job. He was implementing policy. He wasn't making policy. That is what the record says in this case. They took a calculated position in this deal. It was odd because we were taking . . . And this was all on depositions. There was an affidavit proving up a record or something like that. But they just took a very cold, calculated position. I'll tell you, it doesn't matter to you all, but I was scratching my head the whole time. I was like, well, this guy's cold-blooded. I did politics. And we had the McNamara cases going on at the same time. And Sheriff McNamara, Parnell McNamara, he was saying, you know, well, it was these other reasons and it wasn't politics. And Lange just said, nope, they backed the wrong horse. They're out. And if you look at the evidence, it wasn't just the demotion. The gentleman who testified about they backed the wrong horse, which is what Lange said, also said there is no place. The Sheriff Lange said there is no place for them in the jail. That's what he said. And the plan was, under the evidence, to demote them and they would leave. Well, they're not . . . But he said. They're not dismissing . . . I mean, they're not debating causation. No. That's a weird . . . It's very unlike most of the cases we see in this room. It's Texas sheriffs. There you go. Texas sheriffs, I guess. That's all I have. Okay. Thank you very much. Thank you very much. We'll be in recess until 9 o'clock tomorrow morning.